# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-2923
_____

Robert G. Fowler

*Plaintiff - Appellee*

v.

LAC Minerals (USA), LLC,
a Delaware limited liability company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: March 13, 2012
Filed: September 12, 2012

_____

Before MURPHY and GRUENDER, Circuit Judges, and ROSS,[1] District Judge.

_____

GRUENDER, Circuit Judge.

LAC Minerals (USA), LLC ("LAC") and Robert Fowler are bound by an agreement relating to 944 acres of property once targeted for mining development.

_____

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri, sitting by designation.

Fowler filed suit, arguing that the agreement required LAC to assign to Fowler certain portions of the property no longer needed for mining operations. LAC counterclaimed, seeking to quiet title. After resolving certain issues on cross motions for summary judgment and the remaining issues at a bench trial, the district court[2] held that LAC's current refusal to assign any land to Fowler did not breach the agreement but that Fowler retains a reversionary interest in the land. LAC now appeals, arguing that the district court erred in not declaring Fowler's interest in the land extinguished. For the reasons that follow, we affirm.

## I.    BACKGROUND

Fowler's predecessor-in-interest, Viable Resources, Inc. ("Viable"), and LAC's predecessor company, St. Joe American Corporation, entered into a joint venture agreement in 1984 with the goal of developing certain mining prospects in Lawrence County, South Dakota.[3] As part of the joint venture, in 1985 Viable deeded 90 mining claims involving approximately 944 acres of land to LAC. In the deed, Viable reserved a right "to obtain a reconveyance in the property . . . as specified in" an amended joint venture agreement.[4] The parties agree that a 1988 Restated Joint Venture Agreement ("RJVA") superseded the amended joint venture agreement

[2]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota.

[3]Through a series of corporate name changes, St. Joe American Corporation became St. Joe Gold Corporation, which eventually became Bond Gold Richmond Hill, Inc. After additional name changes and a merger, the company became LAC. For simplicity, we subsume all of these entities under the name "LAC."

[4]One of the ninety mining claims that "was previously inadvertently omitted" in the parties' initial agreement was transferred by a separate deed in 1987, and that deed also referred to rights reserved to Viable under the amended joint venture agreement. Because no party argues that this second deed should be construed differently from the first deed, we refer solely to the first deed.

referenced in the deed and that the RJVA is the controlling agreement. The parties also agree that the right to obtain a reconveyance referred to in the deed is defined in section 4.3 of the RJVA, which reads as follows:

> Release of Property - During the course of the conduct of mineral exploration under this Agreement the Manager [LAC] may in its sole discretion determine that certain portions of the Property have little potential for containing minerals of economic value or will not be required for mineral development or mining facilities. Upon annual review the Manager may eliminate such portions of the Property from the terms of this Agreement, and in such event [LAC] will reassign any such portions to Viable.

Section 2.1 of the RJVA establishes a minimum term of fifty years for the agreement, subject to extension under certain conditions. In 1992, however, state mining regulators issued a "stop order" for all mining operations on the property because of problems with acid drainage. There is no dispute that, as a result of the "stop order," no mineral exploration has occurred since 1993. LAC is obligated by state regulations to continue environmental reclamation and monitoring on certain portions of the property for the indefinite future.

Fowler, one of the original organizers of Viable, succeeded to Viable's rights in the property in November 1999.[5] On October 11, 2001, Fowler formally requested the release of land not being used for mining purposes. Over the next several years, LAC sent occasional communications indicating that it was in the process of determining which portions of the 944 acres could be released, but it never made such a determination. In 2008, Fowler sued (1) for a declaratory judgment that LAC was obligated to reassign any portion of the property that became unneeded for mining or reclamation efforts, (2) for specific performance of that obligation with respect to

---

[5]Fowler acquired the rights from a friend and business associate, Donn C. Douglass, Viable's largest shareholder in 1999, who in turn acquired the rights from Viable in 1997.

portions currently not needed, and (3) to quiet title for such portions. LAC counterclaimed for a declaratory judgment that it owned the 944 acres "absolutely . . . as against Fowler and all persons claiming under him" and to quiet title "against all claims of Fowler and all persons claiming under him."

On cross motions for summary judgment, the district court concluded that LAC held the property in fee simple subject to a condition subsequent requiring it "to reassign the property back to" Fowler "when the mining deed's purposes are exhausted." After an ensuing bench trial, the district court found that the transfer of Viable's reversionary rights to Fowler was not precluded by S.D.C.L. § 43-4-3, which states that "[a] mere right of reentry, or of repossession for breach of a condition subsequent, cannot be transferred to anyone except the owner of the property affected thereby," because the deeds and RJVA established a covenant running with the land, rather than a "mere" right of reentry. However, the district court held that LAC had "acted in good faith in its decision to not release any of the [land] for reversion under Section 4.3 . . . at this time" and that LAC was not required to release any of the land at that time.

LAC now appeals, arguing that the district court erred in holding that Fowler retains an interest in the land. In support, it contends that (i) section 4.3 of the RJVA did not create a condition subsequent, but rather a contractual covenant for which damages would be the only remedy for breach; (ii) even if the RJVA did create a condition subsequent in favor of Viable, Viable was precluded from transferring its associated rights by S.D.C.L. § 43-4-3; and (iii) whatever rights Fowler might have had under the RJVA to obtain the property are a nullity because mineral exploration ended in 1993.

## II.    DISCUSSION

"When the district court conducts a bench trial as it did here, we review the district court's fact finding for clear error, and we review legal conclusions and mixed questions of law and fact de novo." *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 804 (8th Cir. 2008). Our jurisdiction in this case is based on diversity of citizenship, and the parties agree that South Dakota law governs. *See Kaufmann v. Siemens Med. Solutions USA, Inc.*, 638 F.3d 840, 843 (8th Cir. 2011).

Under South Dakota law, "[w]e interpret a deed as we would a contract." *Full House, Inc. v. Stell*, 640 N.W.2d 61, 63 (S.D. 2002). "Construction of a deed is a question of law," and we must "examine the instrument as a whole to determine what type of conveyance was intended. If the language of a deed leaves doubt on the intention of the parties, we will consider all the attendant circumstances existing at the time of execution." *Swaby v. N. Hills Reg'l R.R. Auth.*, 769 N.W.2d 798, 808 (S.D. 2009) (internal citation omitted). "In order to ascertain the terms and conditions of a contract, we must examine the contract as a whole and give words their 'plain and ordinary meaning.'" *Gloe v. Union Ins. Co.*, 694 N.W.2d 252, 260 (S.D. 2005) (quoting *Elrod v. Gen. Cas. Co. of Wis.*, 566 N.W.2d 482, 486 (S.D. 1997)).

LAC first asserts that section 4.3 of the RJVA establishes a contractual covenant, rather than a condition subsequent. "The chief distinction between a condition subsequent and a covenant pertains to the remedy in the event of a breach, which in the former subjects the estate to a forfeiture and in the latter is merely a ground for recovery of damages." *Rowbotham v. Jackson*, 5 N.W.2d 36, 37 (S.D. 1942) (quoting *Rooks Creek Evangelical Lutheran Church v. First Lutheran Church of Pontiac*, 124 N.E. 793, 795 (1919)). "Whether a clause shall be construed to be a condition subsequent or [a] covenant must depend upon the contract or circumstances and the intention of the party creating the estate." *Id.* (quoting *Rooks Creek*, 124 N.E. at 795). "Forfeitures and condition subsequent not being favored in law, a deed will

-5-

not be construed to create a conditional estate unless the language used unequivocally indicates an intention . . . to that effect." *DeHaven v. Hall*, 753 N.W.2d 429, 435 (S.D. 2008) (omission in original) (quoting *City of Huron v. Wilcox*, 98 N.W. 88, 89 (S.D. 1904)).

In this case, the deed specifically refers to a "right[] to obtain a *reconveyance* in the property . . . as specified in" the parties' agreement (emphasis added). In turn, the referenced agreement states that, should certain specified events occur with respect to any portion of the property, LAC "will *reassign* any such portions to Viable" (emphasis added). This express language unequivocally establishes the grantor's right to reacquire the relevant portions of the deeded estate upon occurrence of the stated conditions. *Cf. DeHaven*, 753 N.W.2d at 436-37 (finding a deed established a covenant that was susceptible to a remedy only of damages, rather than a condition subsequent to be remedied by reversion to the grantors, where the deed stated a duty to maintain the granted easement but included "no language that expressly or implicitly provides that the easement will be forfeited if [the grantees] fail to maintain it"). As a result, we agree with the district court that the deed here establishes a condition subsequent, rather than a covenant.

In opposition, LAC argues that section 4.3 cannot create a condition subsequent because it gives the grantor no power to terminate the estate. "A conveyance that creates a fee simple estate subject to a condition subsequent provides the grantor, heirs, and successors a *power to terminate* upon the happening of the stated event, i.e., when a condition is broken." *Swaby*, 769 N.W.2d at 808. LAC contends that it, rather than Viable, enjoyed sole power to terminate the estate because section 4.3 gives LAC "*sole discretion* [to] determine that certain portions of the Property" will not be needed for mining purposes and states that LAC "*may* eliminate such portions of the Property from the terms of this Agreement" (emphases added). To be sure, LAC is vested with broad discretion in determining which portions of the property are unneeded for mining operations and eliminating those portions from the scope of its

mining management. However, this determination constitutes the condition subsequent itself, not the resulting power to terminate. If, for whatever reason, the determination and elimination decisions are made, section 4.3 states that "in such event [LAC] *will reassign* any such portions to" the grantor (emphasis added). Because the grantor has the power to terminate by demanding reassignment if the condition subsequent comes to pass, the basic structure of a condition subsequent is satisfied, regardless of the degree of LAC's control over the condition subsequent.

LAC next asserts that Viable was precluded from transferring its rights associated with the condition subsequent by S.D.C.L. § 43-4-3. Section 43-4-3 prohibits the assignment to a third party of a grantor's right of reentry or repossession unless the original instrument contemplated such assignments or otherwise indicated an intent for the restriction to run with the land. *See Rowbotham*, 5 N.W.2d at 37-38 (holding that an identically worded predecessor statute prohibited the assignment of a grantor's rights under a reverter clause where the "reverter language used in the deed . . . runs to [the grantors] personally, and not to their assigns"). Here, we agree with the district court that the RJVA expressly contemplated the assignment of Viable's right of repossession under section 4.3. In particular, section 11.1 of the RJVA expressly authorizes each party to assign "its rights in the Agreement" to any affiliate of that party, without restriction.[6] LAC identifies no provision of the deed or the RJVA that would suggest Viable's reversionary rights under section 4.3 were somehow excluded from the general assignment provisions of section 11.1. Because the plain language of the parties' agreement, *see Gloe*, 694 N.W.2d at 260, establishes Viable's right to make certain assignments, Viable held more than a "mere" right of repossession, *see* S.D.C.L. § 43-4-3. Thus, the transfer of Viable's right of repossession to Fowler was not precluded by statute.

---

[6]The district court found that both Douglass (the intermediate assignee) and Fowler were "affiliates" of Viable for purposes of section 11.1, and LAC does not challenge that finding.

Finally, LAC contends that Fowler's right to obtain reassignment of the property has become a nullity because mineral exploration ended in 1993. LAC argues that, under the plain language of section 4.3, it is only "[d]uring the course of the conduct of mineral exploration under this Agreement" that LAC may identify "certain portions of the Property [that] have little potential for containing minerals of economic value or will not be required for mineral development or mining facilities." In LAC's view, because it never identified such portions of the property before mineral exploration ended in 1993, there never will be "such portions of the Property" to reassign as mandated in the second sentence of section 4.3. LAC also makes a corollary argument that the statute of limitations on Fowler's declaratory judgment claim must have begun to run no later than 1993. Fowler responds that LAC's duty to reassign "such portions" in the second sentence of section 4.3 reaches not only those portions that were specifically identified "[d]uring the course of the conduct of mineral exploration" but also any similar portions no matter when they are identified.

We must resolve the dispute by giving the words used in the RJVA their "plain and ordinary meaning." *Gloe*, 694 N.W.2d at 260 (quoting *Elrod*, 566 N.W.2d at 486). In this case, the word "such" has two potentially applicable definitions: "of the character, quality, or extent previously indicated or implied," and "of the same class, type, or sort." *Merriam-Webster's Collegiate Dictionary* 1247 (11th ed. 2005). As a result, the reference to "such portions" of property in the second sentence of section 4.3 means not just the specific portions of property identified during the time frame mentioned in the first sentence, but also any other portions of property with the same "character, quality, or extent" or "of the same class, type, or sort" as that established in the first sentence—that is, portions that are unnecessary for the stated mining purposes. Accordingly, under the second sentence of section 4.3, LAC has a continuing duty to "reassign any such portions" to Fowler, regardless of whether the

portions were identified prior to 1993.[7] The district court did not err in holding that Fowler retains an ongoing reversionary interest in the property.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment that Fowler retains a reversionary interest in the land.

_____

_____

[7]The district court noted LAC's broad discretion in reviewing the use of the property under section 4.3 and found that, as of the time of the district court's judgment, LAC had exercised this continuing duty in good faith. Fowler did not appeal the district court's ruling. To the extent LAC argues in its reply brief that the district court erred by determining that an implied duty of good faith and fair dealing applies to its exercise of discretion under section 4.3, we decline to address the merits of the argument. *See Cavegn v. Twin Pipe Trades Pension Plan*, 333 F.3d 879, 882 n.2 (8th Cir. 2003) (declining to address an argument raised for the first time in a reply brief).